# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

DEBORAH KOGER,

      Plaintiff,

v.                                                      Civil Action No. 3:09cv90

C.T. WOODY, in his official capacity
as Sheriff, City of Richmond, Virginia,

      Defendant.

## MEMORANDUM OPINION

Before the Court is Defendant C.T. Woody's Motion for Summary Judgment. (Docket No. 37.) Plaintiff Deborah Koger has responded. (Docket No. 57.) On December 4, 2009, Woody replied. (Docket No. 60.) On December 8, 2009, the Court heard oral argument. Following oral argument, the parties supplemented the record with a Joint Stipulation Regarding EEOC File. (Docket No. 63.) At the Court's invitation, Woody also submitted supplemental briefing addressing cases raised by Koger during oral argument. (Docket No. 64.) Koger responded. (Docket No. 65.) The matter is ripe for disposition. The Court exercises jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 636(c). For the reasons that follow, the Court will GRANT Woody's Motion for Summary Judgment. (Docket No. 37.)

## I. Procedural Background

Koger filed her original Complaint on February 17, 2009. On June 22, 2009, upon the consent of the parties, the Honorable Robert E. Payne referred the case to the undersigned Magistrate Judge. On June 29, 2009, in accordance with Judge Payne's Memorandum Opinion

and Order granting in part and denying in part Woody's motion to dismiss (Docket Nos. 16, 17),

Koger filed her Second Amended Complaint (Docket No. 20).

Koger, a Caucasian woman, formerly served as a Sheriff's Deputy in the City of

Richmond Sheriff's Office ("Sheriff's Office"). (2d Am. Compl. ¶ 1.) She brings a single cause

of action under Title VII of the Civil Rights Act, 42 U.S.C. § 2000 *et seq.*, alleging that she

suffered numerous instances of retaliation by the Sheriff's Office for being willing to testify on

behalf of plaintiffs Robert Garrett and Eric Aycock in *Garrett v. Woody*, 3:07cv286 (E.D. Va.

Aug. 1, 2008), a reverse discrimination Title VII action against Sheriff Woody. (2d Am. Compl.

¶ 111.) Specifically, Koger contends that the retaliation stemmed from her workplace support of

one of the plaintiffs in that case, Eric Aycock, and as a result of Koger's decision to file claims

with the Equal Employment Opportunity Commission ("EEOC") against Woody. (2d Am.

Compl. ¶ 111, 112.) Koger alleges that Woody retaliated:

> [by accusing Koger] of infractions she had not committed, in removing her from her post
> and placing her in a dangerous environment, despite her seniority and repeated requests to
> return to the Jail Annex, in subjecting her to repeated IAD investigations in violation of
> the Department's SOP, in thwarting her right to properly appeal her infractions in
> violation of the SOP, in terminating her from her position, and in denying and repeatedly
> appealing, for no meritorious reason, her right to Unemployment Compensation benefits.

(2d Am. Compl. ¶ 111.) Woody, however, contends that his dismissal of Koger stemmed from

an overall record of poor performance. The facts are presented below in the light most favorable

to Koger.

## II. Factual Background

### A. The Garrett and Aycock Matters in 2006 and 2007

#### 1. Garrett's Erroneous Release of a Prisoner in September 2006

On September 27, 2006, Deputy Robert Garrett erroneously released an inmate from the custody of the Sheriff's Office.[1] (Def.'s Br. in Supp. of Mot. for Summ. J. 3, ¶ 15.) Sgt. William Bart investigated the September 27, 2006 erroneous release, but he did not interview Koger because Garrett did not mention Koger in his written incident report. (Oct. 2009 Bart Decl. ¶¶ 3, 5.) Koger did not receive any sort of reprimand for this incident. (Oct. 2009 Bart Decl. ¶ 6.) Woody terminated Garrett's employment as a result of this incident. (Woody Decl. ¶ 3.)

#### 2. Aycock's Erroneous Release of a Prisoner in January 2007

On January 17, 2007, Deputy Eric Aycock erroneously released a male prisoner from the custody of the Sheriff. (Def.'s Br. in Supp. of Mot. for Summ. J. 4, ¶ 18; Oct. 2009 Bart Decl. ¶ 7.) The same day Aycock mistakenly released a prisoner, *Style Weekly* published an article reviewing Garrett's error in September 2006, his subsequent termination, and his claim that Woody wrongfully terminated Garrett based on "racist employment practices." (Pl.'s Resp. Ex. E, *Style Weekly* Article.)

Aycock and Koger each drafted a written incident report. Aycock's written incident report indicated that Koger had told Aycock the male prisoner was "good to go," which Aycock

---

[1] In a written incident report, "Garrett accepted responsibility for the release, blamed it on his own oversight, and never blamed Sgt. David [his supervisor]." (Def.'s Br. in Supp. of Mot. For Summ. J. Ex. B, Oct. 2009 Bart Decl. ("Oct. 2009 Bart Decl."), ¶ 5.) Garrett later accused others of partial responsibility for the erroneous release of the prisoner. (Pl.'s Resp. 3; Pl.'s Resp. Ex. Z, Compl., *Garrett v. Woody*, ¶¶ 4, 6 (stating that David ordered Garrett to release the prisoner).)

understood to mean that the male prisoner was ready to be released. (Oct. 2009 Bart Decl. ¶ 7.) Koger's written incident report stated that she had told Aycock that a different prisoner was "good to go," and that Aycock had been ordered to release a female inmate.[2] (Oct. 2009 Bart Decl. ¶ 9.)

Sgt. William Bart, who had investigated the Garrett matter, also investigated Aycock's erroneous release. (Oct. 2009 Bart Decl. ¶ 7.) Koger asserts that Bart's investigation focused not only on the erroneous release, but also on the *Style Weekly* article. Bart's notes confirm that on January 19, 2007, he questioned Koger about whether Aycock had distributed copies of the *Style Weekly* article amongst the deputies. (Pl.'s Resp. Ex. F, File Name FULTON, Giorgio Shapiro, at 5.) Bart states that Woody was "paranoid about the negative press surrounding" the incidents of erroneous release, noting that Woody had wrongly accused Bart of circulating the article. (Pl.'s Resp. Ex. A, Nov. 2009 Bart Aff. ("Nov. 2009 Bart Aff."), ¶ 14.)

Upon completion of his investigation of the incident, Bart found Aycock, Koger, and their supervisor, Sgt. David, responsible for the January 17, 2007 erroneous release. (Pl.'s Resp. 3.) Col. D.W. Clevert, Chief of the Internal Affairs Division ("IAD"), "wanted everyone on that shift: Sergeant David, Eric Aycock, and Deborah Koger, fired." (Nov. 2009 Bart Aff. ¶ 7.) Bart disagreed with Clevert's recommendation as to Koger because she was not solely responsible for the erroneous release.[3] (Nov. 2009 Bart Aff. ¶ 7.) Bart instead drafted a written reprimand

---

[2] Although Bart states that during his investigation, "[n]either Aycock nor Koger told me that [their supervisor] ordered Aycock to release the male prisoner" (Oct. 2009 Bart Decl. ¶ 11), Koger contends that she told Bart that Sgt. David, her supervisor, was culpable for the release. (Pl.'s Resp. Ex. G, Koger Aff. ("Koger Aff."), at 1.)

[3] Bart makes no mention of whether he agreed or disagreed with the recommended terminations of Aycock and David.

against Koger for the January 17, 2007 incident (Oct. 2009 Bart Decl. ¶ 12), and ultimately issued only an oral reprimand "so that [he] could save her job, as clearly, Clevert wanted her punished" (Nov. 2009 Bart Aff. ¶ 9). Koger states that the only punishment she received as a result of this erroneous release was an oral reprimand from Bart, which the Court presumes to be true for summary judgment purposes.[4] (Def.'s Rebuttal Br. in Supp. of Mot. for Summ. J. ("Def.'s Rebuttal") Ex. C, Koger Dep. ("Koger Dep."), at 86:4-9.) Woody fired Aycock as a result of this incident. (Woody Decl. ¶ 3.)

After his termination, Aycock joined Garrett in a suit against Woody in the Circuit Court for the City of Richmond. Woody removed the suit to this Court. On February 15, 2008, Garrett and Aycock filed a witness list naming Koger as a witness on their behalf and an exhibit list identifying the January 8, 2008 and February 8, 2008 affidavits of Koger as some of the plaintiffs' exhibits. (Pl.'s Resp. Exs. K, L.)

## B.    Koger's Attendance Record at the Sheriff's Office

Koger contends throughout her briefing that she did not violate the Sheriff's Office Standard Operational Procedures ("SOPs") as to absences because the SOPs do not require a doctor's note for each absence. (*See, e.g.*, Pl.'s Resp. 8). Koger does not dispute the pertinent language in the Sheriff's Office Employee Leave Policy, which states:

> If an employee is absent three or more consecutive working days, he/she may be required to bring in a doctor's slip. Employee must present the doctor's note to their immediate supervisor on the first day they return to work. The doctor's note must contain the date of

---

[4] Lt. Col. Carol Dabney, Koger's supervisor in the Jail Annex, states she drafted a written reprimand for Koger based on this incident dated January 16, 2007. (Def.'s Br. in Supp. of Mot. for Summ. J. Ex. F, Dabney Decl. ¶ 5.) Koger denies receiving Dabney's written reprimand. (Def.'s Br. in Supp. of Mot. for Summ. J. 6, ¶ 25.)

the visit and a date the employee may return to work. The doctor's statement must be the original doctor's statement and turned in with the "Application for Leave Form."

(Pl.'s Resp. Ex. W, SOP 315 Employee Leave Policy ("Employee Leave Policy"), Procedures ¶ I.E.6; *see also* Pl.'s Resp. Ex. D, Felthoff Aff. ("Felthoff Aff."), ¶¶ 14-15), Ex. S, Michaels Aff. ("Michaels Aff."), ¶ 7.) However, if a supervisor suspects an employee of a pattern of consistent absenteeism, "[t]he supervisor may require the employee to bring a doctor's slip for each occurrence." (Employee Leave Policy Procedures ¶ I.E.7.)

### 1. Attendance Record During Mitchell's Administration

The Richmond City Sheriff's Office hired Koger in May of 2000, when Michelle Mitchell served as Sheriff. (Def.'s Br. in Supp. of Mot for Summ. J. Ex. T, Winzor Decl. ("Winzor Decl."), ¶ 3.) (Docket No. 38.) Between 2000 and 2006, Koger received seven written notices and one counseling notice that she failed to follow procedures to call in sick, failed to document absences, or was excessively absent.

Her first written notice came on July 24, 2000, when the Sheriff's Office issued Koger a written reprimand for failure to properly notify her supervisors that she would be absent from work.[5] (Winzor Decl. ¶ 5, Ex. 1.) The disciplining supervisor recommended that Koger serve a five-day suspension. (Winzor Decl. ¶ 5.) In April 2001, Koger received a counseling notice, and in May 2002, a written reprimand, for failure to use proper call-in procedures as designated in the SOPs. (Winzor Decl. ¶ 6, Ex. 2; ¶ 7, Ex. 3.) Later in May 2002, the Sheriff's Office

---

[5] The reprimand noted that she had been employed only sixty-two days, but absent five. (Winzor Decl. ¶ 5, Ex. 1.)

issued Koger a written notice for excessive absenteeism in the preceding year.[6] (Winzor Decl. ¶ 8, Ex. 4.)

On June 4, 2002, then-Sheriff Mitchell reviewed the situation and issued Koger an oral notice, which warned Koger "that in the future, anytime you are sick or out of work you are required to provide documentation." (Winzor Decl. ¶ 9, Ex. 5.) Nevertheless, just over one month after Mitchell's counseling, on August 8, 2002, Koger again received a written notice for her failure to follow the proper procedures to call in sick because she did not call in at least one hour prior to the commencement of her shift. (Winzor Decl. ¶ 10, Ex. 6.)

In April 2003 Koger received another written notice for the same infraction. (Winzor Decl. Ex. 7.) Also in April 2003, Koger failed to attend a meeting and received a written notice for failing to acquire prior approval to do so. (Winzor Decl. ¶ 12, Ex. 8.) Finally, on November 10, 2003, the Sheriff's Office issued Koger a written notice for her failure to provide documentation from her physician when she missed work.[7] (Winzor Decl. ¶ 13, Ex. 9.) Koger does not dispute that these reprimands occurred.[8] Rather, she offers the declaration of Bart, who supervised her "in 2004, at the jail, and in 2005, at the jail lock-up." (Nov. 2009 Bart Decl. ¶ 3.)

---

[6] The Sheriff's Office issued the report because Koger was absent seven times within the preceding year without any documentation by a physician. (Winzor Decl. Ex. 4.) This constituted a violation of the SOP that defined excessive absenteeism as six or more days absent within the preceding year without a supporting doctor's note. (Winzor Decl. Ex. 4.)

[7] In the written notice, the Sheriff's Office noted that Koger had informed the Sheriff that she would have a note to excuse her absence on November 1, 2003 and that she would be present on November 2, 2003, but that Koger again called in sick on November 2, 2003 without providing documentation. (Winzor Decl. Ex. 9.)

[8] Instead, Koger states that despite some absences during this time frame, "she was not a bad employee or a discipline problem." (Pl.'s Br. in Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp."), at 3.)

Bart states that, while he supervised her, Koger never failed to bring in a doctor's note when she was sick, he considered Koger highly skilled, and that he once remarked that if he could have hand-chosen staff, Koger would have been included. (Nov. 2009 Bart. Decl. ¶¶ 6, 10.)

The record has no evidence of any disciplinary action between November 2003 and February 2006, but, as noted below, 2006 began with a recommendation for termination due to excessive absenteeism.

### 2. Attendance Record During Woody's Administration

On January 1, 2006, Woody became Sheriff of the City of Richmond. (Def.'s Br. in Supp. of Mot. for Summ. J. Ex. U, Woody Decl. ("Woody Decl."), ¶ 2.) Woody contends that, "in February 2006, Capt. Gary Sink recommended that Deputy Deborah Koger be fired for setting a pattern of absences." (Woody Decl. ¶ 2.) This recommendation came nearly one year prior to the Aycock incident. Woody retained Koger despite Sink's recommendation because he sought to give her an opportunity to succeed in the new administration. (Woody Decl. ¶ 2.) Koger does not dispute that this occurred.

As detailed below, during the Woody Administration, Koger received reprimands for improperly calling in sick, for failure to follow direction as to sick leave, and for excessive absenteeism or unavailability for work.

### a. Sgt. Olsen's Reprimand in December 2007

On New Year's Eve in 2007, nearly one year after the Aycock erroneous release, Koger called in sick at 11:48 p.m., twelve minutes before her shift started. (Def.'s Br. in Supp. of Mot. for Summ. J. 10, ¶ 46; Ex. O, Olsen Decl. ("Olsen Decl."), ¶ 3.) This constituted a violation of SOP 315, which required a sick employee to call in no later than one hour prior to her shift

beginning.  (Olsen Decl. ¶ 3.)  Olsen reprimanded Koger.[9]  (Olsen Decl. ¶¶ 3-5.)  Koger does not dispute that the reprimand occurred.

### b.     Capt. McRae's Written Reprimand in January 2008

In early January 2008, just after Koger called in sick on New Year's Eve, Capt. Ken McRae reviewed Koger's file and drafted a written reprimand for excessive absenteeism in 2007.[10]  (Def.'s Br. in Supp. of Mot. for Summ. J. 12, ¶ 53; Def.'s Br. in Supp. of Mot. for Summ. J. Ex. L, McRae Decl. ("McRae Decl."), ¶ 3.)  McRae found that Koger had been absent six days in 2007 without a supporting doctor's note and recommended that she receive one to three days of suspension "because she was excessive and this was not the first time she had attendance problems."  (McRae Decl. ¶¶ 3, 5.)

On January 10, 2008, McRae served Koger with the written reprimand.  (McRae Decl. ¶ 6.)  This resulted in a three-day suspension, with two days suspended for ninety days.  (Def.'s Br. in Supp. of Mot. for Summ. J. Ex. S, Whitt Decl. ("Whitt Decl."), ¶ 7.)  Disciplinary Review Officer Maj. Whitt, who reviewed the recommendation and approved it on January 10, 2008,

---

[9] Olsen's Declaration inconsistently states the type of punishment inflicted on Koger. Olsen states both that he drafted and served on Koger a written reprimand (Olsen Decl. ¶¶ 3, 5), and that he recommended only an oral reprimand as appropriate punishment (Olsen Decl. ¶ 4). This discrepancy is immaterial, and the Court presumes an oral reprimand commenced. Koger does not dispute that she received some form of punishment, whether written or oral, for this incident. (*See* Pl.'s Resp. 6-7 (failing to argue that Koger never received a reprimand from Olsen).) Moreover, all reprimands consist of a typewritten form, but the type of punishment recommended on that typewritten form may be either an oral reprimand or a written reprimand.

[10] Capt. McRae is charged with ensuring that Sheriff's Office employees attend work. (McRae Decl. ¶ 4.) McRae indicates that he previously has disciplined employees for problems such as excessive absenteeism. (McRae Decl. ¶ 4.)

stated that he imposed this sentence based on his review of the Olsen reprimand and his "knowledge of Koger's extensive problem with attendance." (Whitt Decl. ¶ 7.)

### c.     Lt. Thompkins's Written Reprimand in February 2008

On February 16, 2008, more than a year after the Aycock erroneous release and one month after her suspension for calling in sick on New Year's Eve, Koger again called in sick prior to the time her shift was scheduled to begin. (Def.'s Br. in Supp. of Mot. for Summ. J. 13, ¶ 62.) Lt. Richard Thompkins "ordered Koger to call-in a second time one hour after her schedule shift had begun." (Def.'s Br. in Supp. of Mot. for Summ. J. 13, ¶ 62 & Ex. R, Thompkins Decl. ("Thompkins Decl."), ¶ 3.) Koger disobeyed Thompkins's order by failing to call in a second time one hour after her shift had begun. (Thompkins Decl. ¶ 4.) Koger testified that she knew the order was issued by Thompkins and relayed to her by another deputy, but that she was not required to comply with the orders of another deputy, nor to call in a second time. (Koger Dep. 102:6-21.)

Because failure to obey the orders of superior officers constitutes a violation of an SOP, in a February 18, 2008 written reprimand Thompkins recommended that Koger receive a three-day suspension. (Thompkins Decl. ¶¶ 5-6.) Thompkins felt the punishment fit the seriousness of the event, and he sought to discourage Koger from again failing to obey direct orders. (Thompkins Decl. ¶ 6.)

### d.     Koger's Appeal of McRae's and Thompkins's Reprimands in February 2008

On February 25, 2008, Col. William Burnett heard Koger's appeals of McRae's and Thompkins's reprimands. (Whitt Decl. ¶ 10.) Koger was prepared to go forward only with her

appeal of McRae's reprimand for excessive absenteeism. (*See* Koger Aff. 6.) No hearing occurred for Thompkins's reprimand and the Court will presume, for summary judgment, that Koger was unable to have a full hearing on the matter.[11]

As to McRae's reprimand, the hearing went forward. Whitt testified that Koger "accepted the suspension" recommended in McRae's reprimand. (Whitt Decl. ¶ 10.) At the time, Koger admitted that she did not have a doctor's note for each of her absences (Def.'s Br. in Supp. of Mot. for Summ. J. Ex. W, Koger Stmt. ("Koger Stmt.") ("In all honesty, I have violated the current policy and am willing to accept the one day suspension recommended."). The record contains a statement Koger wrote to Col. Burnett near the time of the reprimand which appears to offer mitigative information. In it, Koger indicates that she had emailed Woody requesting transfer from the midnight shift to a day shift in May and July of 2007. (Koger Stmt.) Koger noted that during the time she served on the afternoon shift in 2006, she took only one sick leave day, and that the midnight shift negatively affected her digestive system and health. (Koger Stmt.)

### e. Maj. Whitt's May 2008 Written Reprimand and Recommendation for Termination

In May 2008, after some disiplinary incidents discussed below, Whitt reviewed Koger's attendance records. (Whitt Decl. ¶ 17.) Whitt "found that Koger's absences for sickness were the worst [he] had ever reviewed" in his career. (Whitt Decl. ¶ 17.) He determined that, "since

---

[11] Whitt asserts that, once in Burnett's office, "Koger dropped her appeal of Lt. Thompkins' Written Reprimand." (Whitt Decl. ¶ 10.) The document before the Court contains a handwritten note to that effect. Koger appears to dispute that she dropped the appeal of Thompkins's reprimand and contends that she was denied due process as required by the Sheriff's Office SOPs, which require all appeals to be in writing and permit deputies up to five days to prepare and submit an appeal. (Koger Aff. 6.)

joining Uniform Operations Koger called-in either sick or family sick thirty-three times between July 15, 2007 and April 18, 2008," and that between January 28 and April 28, 2008, Koger called in sick eleven times. (Whitt Decl. ¶ 20.) Moreover, Whitt found that despite the Sheriff's Office policy of limiting "family sick" days to two per year, Koger had called in family sick nine times between July 2007 and April 28, 2008. (Whitt Decl. ¶ 21.) Whitt also found that Koger had called in sick on February 9, 2008[12] and February 17, 2008[13] after she was denied holiday leave for those same dates. (Whitt Decl. ¶ 26; Whitt Decl. Ex. 8 (denying Koger holiday leave on these dates because two other deputies were already on leave).)

Based on his review of the records, Whitt found that Koger was excessively absent and unavailable for work, in violation of SOP 310 No. 4. (Whitt Decl. ¶ 28.) He recommended Koger's termination. (Whitt Decl. ¶ 28.) On May 5, 2008, Whitt drafted a written reprimand. (Whitt Decl. ¶ 18.)

### C. Koger's Two Claims of Discrimination

Koger filed two claims of discrimination. In 2007, Koger alleged that she was the subject of racial discrimination by the Sheriff's Office. That claim is not before this Court, although Koger contends it provides a basis for some of the retaliatory actions that are before the Court. In 2008, Koger filed a formal charge of retaliation.

---

[12] On February 10, 2008, Koger's supervisor approved her February 9, 2008 Application for Leave form (Pl.'s Resp. Ex. Q, Koger's Leave Record ("Leave Record")), and Koger submitted a doctor's note for this date (Pl.'s Resp. Ex. P, Koger's Doctor's Notes).

[13] On February 18, 2008, Koger's supervisor also approved her February 17, 2008 Application for Leave, although Koger failed to submit a doctor's note for this date. (Leave Record.)

### 1.    Koger's 2007 EEOC Charge of Race Discrimination

On February 26, 2007, approximately one month after Aycock's erroneous release and the publication of the *Style Weekly* article reviewing Garrett's termination, Koger initiated EEOC action on the basis of racial discrimination. (Pl.'s Resp. Ex. H, EEOC Intake Form ("Feb. 2007 EEOC Intake Form"); Joint Stip. ¶ 1.) On July 10, 2007, Koger signed a formal EEOC Charge of Discrimination alleging discrimination on the basis of race. (Joint Stip. ¶ 4; *see* Def.'s Br. in Supp. of Mot. for Summ. J. Ex. X, 2007 EEOC Charge ("2007 EEOC Charge"), at 1.) On July 24, 2007, the EEOC mailed Koger's 2007 EEOC Charge to Woody. (Joint Stip. ¶ 6.)

### 2.    Koger's 2008 EEOC Charge of Retaliation

On January 8, 2008, as McRae was issuing his reprimand for excessive absenteeism but before Whitt's May 2008 recommendation for termination, Koger initiated action with the EEOC on the basis of retaliation.[14] (Def.'s Rebuttal Ex. D, 2008 EEOC Intake Form ("2008 EEOC Intake Form").) This charge alleges retaliatory acts in the nature of a transfer back to the Richmond City Jail and a denial of holiday hours worked. (2008 EEOC Intake Form 1-2.)

On May 8, 2008, Koger signed a formal charge of discrimination, alleging retaliation. (Joint Stip. ¶ 11.) On May 12, 2008, the EEOC mailed notice of this charge to Woody. (Joint Stip. ¶ 12.) The record does not indicate when Woody received notice of this second claim of retaliation.

---

[14] The 2008 EEOC Intake Form asked, "What is the reason (basis) for your claim of employment discrimination?" (2008 EEOC Intake Form 2.) Koger checked the box labeled "sex." (2008 EEOC Intake Form 2.) She did not check the box labeled "retaliation." However, the parties agree that the 2008 EEOC Intake Form opened a retaliation claim. (*See* Joint Stip. ¶¶ 8, 9.)

### D.    Koger's Instances of Discipline Other Than for Attendance in 2008

In 2008, the Sheriff's Office investigated Koger for two incidents unrelated to attendance. In February, she was investigated because she was accused of falling asleep while on duty. In May, she was investigated for photocopying the incident reports detailing the erroneous release of prisoners without permission to do so.

### 1.    Virginia Commonwealth University Investigation in February 2008

On February 5, 2008, more than one year after the Aycock erroneous release but less than a month after Olsen's reprimand for calling in sick on New Year's Eve and McRae's reprimand for excessive absenteeism, a Registered Nurse Manager reported to Whitt that Koger had fallen asleep while guarding an inmate at Virginia Commonwealth University ("VCU") hospital. (Whitt Decl. ¶ 12.) The nurse on duty reported that she had awakened Koger four separate times while Koger was guarding inmate Sunday Lucas. (Def.'s Br. in Supp. of Mot. for Summ. J. Ex. K, Lawson Decl. ("Lawson Decl."), ¶ 4; Lawson Decl. Ex. I, Adult Flowsheet (documenting each instance in which the nurse found Koger sleeping).) Whitt reported the matter to Woody, IAD, and Burnett. (Whitt Decl. ¶ 12.) Woody personally assigned Cpt. Lawson to investigate the incident because Woody sought an independent investigation ("the VCU Investigation") and Lawson had prior expert experience as an investigator with the Richmond City Police Department. (Pl.'s Resp. Ex. B, Woody Dep. ("Woody Dep."), at 33:19-34:4.)

Koger denied sleeping on the job. (Lawson Decl. ¶ 7.) She stated that she had a headache and leaned her head back, closing her eyes. (Lawson Decl. ¶ 7.) At the time, the

patient did not confirm or deny whether Koger was asleep.[15]  During Lawson's investigation,

Koger told him the nurse visited the room only twice during the evening.  (Pl.'s Resp. Ex. M,

Lawson Report 3.)  Contemporaneous medical records and statements show that the nurse

entered the room four times.  (Lawson Decl. ¶ 4, Ex. 2.)  As a result of the VCU Investigation,

Lawson determined "that Koger had fallen asleep while on duty."  (Lawson Decl. ¶ 8.)  Lawson

recommended a 15-day suspension, with five of those days suspended for six months.  (Lawson

Decl. ¶ 8.)

On March 10, 2008, Clevert concurred with Lawson's findings and proposed

recommendation.  (Lawson Decl. ¶ 9.)  On March 13, 2008, Lawson served Koger with the

written reprimand resulting from this incident.  (Lawson Decl. ¶ 9.)

## 2.  May 2008 Incident Reports Investigation

In April and May of 2008, Cpl. Donna Gray and Cpt. Rosalind Jackson reported seeing

Koger access and print incident reports concerning the erroneous release of prisoners from the

custody of the Sheriff's Office.  (Def.'s Br. in Supp. of Mot. for Summ. J. Ex. G, Gray Decl.

("Gray Decl."), ¶ 3 & Ex. J., Jackson Decl. ("Jackson Decl."), ¶¶ 3-4.)  On May 5, 2008,

surveillance cameras showed Koger exit a computer room with documents from the Sheriff's

Office in her hands.  (Def.'s Br. in Supp. of Mot. for Summ. J. Ex. D, Clevert Decl. ("Clevert

Decl."), ¶ 13.)  Thereafter, IAD "began investigating whether Koger was taking documents from

---

[15] *See* Lawson Decl. ¶ 6 ("I interviewed the inmate who Koger was guarding.  She told me that she had looked over two or three times during the night and Koger's eyes were closed.").)  In her brief, Koger suggests that the inmate will testify that Koger was not asleep.  She offers no competent evidence to that effect.  A handwritten note from an interview that appears to have been conducted by Koger comes to the Court unsigned and unsworn.  (Pl.'s Resp. Ex. N, Lucas Stmt.)

the Sheriff's Office" ("the Incident Reports Investigation"). (Clevert Decl. ¶ 12.) Koger does

not deny taking documents, but claims they were not proprietary. (*See* Nov. 2009 Bart Aff. ¶ 17

(stating that Bart has not seen any other employees disciplined for reviewing incident reports).)

E. **Events Immediately Prior to Koger's Termination of Employment**

1. **Burnett's Hearing to Review Lawson's March 2008 Suspension for Sleeping on the Job and Whitt's May 2008 Reprimand and Recommendation for Termination for Excessive Absenteeism**

On May 8, 2008, the same day Koger signed her retaliation charge at the EEOC, Burnett

conducted a hearing for both Lawson's written reprimand for sleeping on the job and Whitt's

written reprimand for excessive absenteeism and unavailability for work. (Def.'s Br. in Supp. of

Mot. for Summ. J. 22, ¶ 100 & Ex. C, Burnett Decl. ("Burnett Decl."), ¶ 11.) Burnett

recommended that Koger serve a 30-day suspension pursuant to Whitt's written reprimand.

(Burnett Decl. ¶ 11.) Burnett found that no other employee had an attendance problem as

significant as Koger's, and "[t]he presence or absence of notes from her physicians was not

relevant to . . . [t]he Written Reprimand . . . for unavailability for work regardless of cause."

(Burnett Decl. ¶ 11.) Burnett noted that Koger did not dispute that she failed to attend work on

the dates in question and that her proffer of her doctor's notes was not relevant to the charge.

(Burnett Decl. ¶ 11.) Koger continues not to dispute her absences. Burnett also concurred with

Lawson's findings and recommendation that Koger serve a 15-day suspension, with five days

suspended, because he determined that the punishment fit the charge that Koger had fallen asleep

while guarding a prisoner. (Burnett Decl. ¶ 13.)

At the conclusion of Burnett's hearing, Koger asked to appeal both suspensions directly to Woody. (Burnett Decl. ¶ 15.) Burnett explained that the decision to hear her appeal fell within Woody's discretion. (Burnett Decl. ¶ 15.)

2.    <u>**Woody Fires Koger**</u>

On May 15, 2008, while she was serving her suspension and three days after the EEOC mailed Koger's retaliation charge to the Sheriff's Office, Koger was instructed to report to the Sheriff's Office, where she was issued an insubordination warning as a result of the Incident Reports Investigation. (Clevert Decl. ¶ 14.) While Koger was at the office, Woody heard Koger's appeals of her suspensions resulting from Lawson's and Whitt's reprimands. (Woody Decl. ¶ 11.)

Woody knew Koger had been investigated and received an insubordination warning for taking documents from the Sheriff's Office, that she had fallen asleep on the job, that Koger had previously disobeyed direct orders from her superiors, and that in 2006, Capt. Gary Sink had recommended her termination due to poor attendance. (Woody Decl. ¶ 11.) Woody agreed with Whitt's recommendation that Koger be terminated. (Woody Decl. ¶ 11.) Woody fired Koger "because of her overall record." (Woody Decl. ¶ 11.) Woody does not say whether or not he knew of Koger's 2008 retaliation claim when he fired her, but he does deny discrimination, retaliation, or asking anyone else to act in that manner on his behalf. (Woody Decl. ¶ 11.)

On May 23, 2008, Koger provided the EEOC with a supplemental letter describing the circumstances of her termination and requesting EEOC action. (Joint Stip. ¶ 15 & Ex. N.)

## F.    Primary Instances of Retaliatory Conduct Alleged by Koger

### 1.    Sgt. Servellon Interview in February 2007

Koger's coworker Sgt. Michael Payne reported to his supervisor, Lt. Russell Hicks, that on February 18, 2007, one month after the Aycock release, "Koger made statements concerning an incident with Deputy Beasley." (Def.'s Br. in Supp. of Mot. for Summ. J. Ex. P, Payne Decl. ("Payne Decl."), ¶ 4.)

> [Koger] had heard of a ridiculous bus accident during which Deputy Beasley (African American), had made a quick u-turn in a Sheriff's Department inmate transfer bus. Apparently, Beasley, who is a large man, slid off the seat while making the u-turn, and was hanging onto the steering wheel, at which time the bus swerved and knocked two departmental vehicles over an eight (8) foot embankment.

(Pl.'s Resp. 4.) Payne reported that "Koger said that since Deputy Beasley is black, Sheriff Woody would sweep the matter under the rug." (Payne Decl. ¶ 4.)  Lt. Hicks reported this event to Internal Affairs. (See Def.'s Br. in Supp. of Mot. for Summ. J. Ex. H, Hicks Decl. ("Hicks Decl."), ¶ 6.) Koger contends the ensuing investigation ("the Beasley Investigation") occurred in retaliation for her support of Aycock.

Koger admits gossiping about Beasley's poor driving. (Pl.'s Resp. 4.) Koger states that she said to Payne and Deputy Allen something about the fact that she might have been treated differently in part because of her race. Koger asserts that during this same conversation, however, Allen made a statement regarding discriminatory actions by the Sheriff's Office under Woody and Mitchell. (Koger Aff. 3.)

In February 2007, the same month Koger signed the EEOC intake form charging race discrimination, IAD officer Sgt. Yarina Servellon was assigned to the Beasley Investigation. (Def.'s Br. in Supp. of Mot. for Summ. J. Ex. Q, Servellon Decl. ("Servellon Decl."), ¶ 3.) On

18

February 27, 2007, Servellon interviewed Koger. (Servellon Decl. ¶ 4.) Servellon states that she informed Koger "that she was being investigated because of negative and derogatory remarks against the Sheriff's Office." (Servellon Decl. ¶ 4.) Koger avers that Servellon refused to tell her what she was accused of saying or to whom she supposedly made the derogatory comments. (Koger Aff. 2.) Koger also states that Servellon told her the alleged comments were made on a day that Koger was actually not scheduled to work. (Koger Aff. 2.) Koger told Servellon that she felt she "was being harassed because of the EEOC Complaint [she] filed against Sheriff Woody and the Richmond City Sheriff's Department." (Koger Aff. 2.)

Koger states that at this point, Servellon turned off the audio recorder and left the interview room, but that Clevert turned the audio recorder back on at Koger's request. (Koger Aff. 2-3.) Koger states that after Clevert turned the recording system on again, she told him the statements made by Allen regarding discrimination by the administration. (Koger Aff. 3.)

Servellon concluded that Payne should draft and issue to Koger a written reprimand for this incident. (Servellon Decl. ¶ 6.) On February 28, 2007, approximately one month after the Aycock mistaken release, Payne issued Koger a written reprimand for "Violation #19: Courteous and Respectful Behavior toward Positions of Authority." (Payne Decl. Ex. 1.) Payne included in the written reprimand that "[o]n several occasions [Koger] has specifically referred to members of the Administration as 'Stupidvisors'. More specifically, she has stated that Sheriff Woody, as well as his Administration, continually practice racism." (Payne Decl. Ex. 1.) Payne also found that Koger "openly stated that only Caucasian deputies appear to get terminated," and that Koger "voices her opinion openly and loudly to and around other supervisors, deputies, prisoners, arresting officers, etc." (Payne Decl. Ex. 1.) Koger was the only one to receive a written

reprimand, but Hicks issued oral reprimands for gossiping to Koger, Allen, and Payne. (Pl.'s Resp. 6; Koger Aff. 3.)

## 2. Koger's Shift Change and Request to Transfer in May and June 2007

Prior to and in early 2007, the Jail Annex operated three employee shifts per day. (Hicks Decl. ¶ 6.) Koger worked the 4:00 p.m.-to-midnight shift. (Hicks Decl. ¶ 6.) In early 2007, however, Hicks designed a new system in which Jail Annex employees worked in two 12-hour shifts because the three-shift rotation created staffing difficulties. (Hicks Decl. ¶ 8.) Hicks reassigned two female deputies from the 4:00 p.m.-to-midnight shift, one of whom was Koger, to the new 7:00 p.m.-to-7:00 a.m. night shift.[16] (Hicks Decl. ¶ 9.) Before the new schedule was implemented, Koger sought the new day shift.

Because she could not get the shift she desired, Koger requested that Hicks transfer her to another department, but Hicks states he lacked to power to do so.[17] (Hicks Decl. ¶ 12.) On May 13, 2007, two days before the formal implementation of the new shift system (Hicks Decl. ¶ 10), Koger emailed Woody and requested that she be moved to the day shift for health

---

[16] Hicks states that allocated duties led him to seek an even number of women on both shifts, and states he already had four female deputies on the new day shift, but only two women deputies on the overnight shift. (Hicks Decl. ¶ 9.)

[17] The Sheriff's Office permits employees to transfer from one department to another department within the Sheriff's Office by submitting a letter of intent to Human Resources. (Winzor Decl. ¶ 18.) Woody's policy, however, allowed staff members to come to him personally seeking interdepartmental transfers, and a letter of intent was not required prior to a transfer. (Felthoff Aff. ¶ 13.) With or without a letter of intent to transfer, Woody makes the final decision concerning a transfer. (Winzor Decl. ¶ 18.) Koger did not submit to Human Resources a letter of intent to transfer. (Woody Decl. ¶ 10.)

reasons[18] (Pl.'s Resp. Ex. V, Koger Email to Woody ("May 13, 2007 Koger Email")). On July 11, 2007, Woody transferred Koger out of the Jail Annex, but did so to another midnight shift, albeit a shorter one: the midnight-to-8:00 a.m. shift in Uniform Operations. (Woody Decl. ¶ 9.)

Woody testified that he transferred Koger because the Uniform Operations shift needed deputies. (Woody Decl. ¶ 9; Whitt Decl. ¶ 36.) However, Woody transferred Koger even though she already had "sent many e-mails to [her supervisors] and Sheriff Woody expressing . . . [her] request to work the day shift."[19] (Koger Aff. 3.) In addition, Koger contends that "[t]ransfers to the back of the jail (especially the midnight shift) are considered a form of punishment within the Department." (Koger Aff. 4.) At times, Koger manned the W1 post, which required her to walk the perimeter of the jail.[20] (Whitt Decl. ¶¶ 35-37.) "The W-1 post at the jail is just about the worst assignment at the Department." (Nov. 2009 Bart Aff. ¶ 11.)

---

[18] Koger also asserted that she had seniority over the women placed on the day shift. (May 13, 2007 Koger Email; Koger Aff. 3.) Hicks testified that he did not move employees based on seniority, but rather based on need. (Hicks Decl. ¶ 11; *see also* Whitt Decl. ¶ 33 (noting that posts during shifts are not assigned based on seniority).)

[19] The Court has before it one such email. (*See, e.g.,* May 13, 2007 Koger Email.)

[20] Koger worked the W1 post approximately 1.7 times per month in the nine months she was assigned to Uniform Operations. (Whitt Decl. ¶¶ 37-38.)

### 3.    Post-Termination Allegation of Retaliation[21]

On May 16, 2008, Koger filed a claim with the Virginia Employment Commission

("VEC") for unemployment benefits. (Def.'s Br. in Supp. of Mot. for Summ. J. Ex. E, Cooley

Decl. ("Cooley Decl."), ¶ 3.) On June 10, 2008, the VEC issued a written opinion disqualifying

Koger from unemployment benefits because of her misconduct. (Cooley Decl. ¶ 5, Ex. 2.) The

VEC found that Koger had violated the Sheriff's Office leave policy because she was written up

for a violation of the policy in January of 2008, and was then absent eleven times between

January 28, 2008 and April 28, 2008, providing documentation from a physician for only five of

those eleven days. (Cooley Decl. Ex. 2.)

On July 1, 2008, Koger appealed the decision of the VEC. (Cooley Decl. ¶ 6, Ex. 3.)

After a hearing, on October 21, 2008, the VEC reversed the previous ruling and qualified Koger

---

[21] Although Koger asserts three retaliatory actions resulting from her termination: that
Woody appealed her award of unemployment benefits without merit (2d Am. Compl. ¶ 111); that
Woody maligned her to prospective employers (Pl.'s Resp. 1); and, that she has been followed,
both before and after her termination, by Sheriff's Office employees (Koger Aff. 6; Koger Dep.
211:12-15), the Court will consider only Koger's claim that Woody's appeal of the VEC's award
of unemployment benefits was retaliatory. In her Second Amended Complaint, Koger clearly
identifies this action as an allegedly retaliatory action taken by Woody, and the Court assumes,
without finding, that it may be reasonably related to the underlying EEOC charge. *See Evans v.
Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996) ("Only those discrimination
claims stated in the initial charge, those reasonably related to the original complaint, and those
developed by reasonable investigation of the original complaint may be maintained in a
subsequent Title VII lawsuit.")
   The Court will not consider Koger's claims that she has been maligned and followed
because Koger raised these claims only in her brief in response to Woody's motion for summary
judgment. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A
plaintiff may not amend her complaint through argument in a brief opposing summary
judgment."); *see also Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563
& n.16 (4th Cir. 2008) (No. 07-1084), *available at* 2008 WL 238562, at *6 (noting that other
circuits similarly prohibit a plaintiff from raising new claims in opposition to summary judgment
and noting that district courts within the United States Court of Appeals for the Fourth Circuit
have adopted *Gilmour*).

for unemployment benefits. (Cooley Decl. Ex. 5, Decision of Appeals Examiner.)[22] The VEC held that Koger's use of her sick leave was approved by her supervisor and that Koger "called in each and every time that she was going to be absent." (Cooley Decl. Ex. 5, Decision of Appeals Examiner 3.)

The Sheriff's Office appealed the decision of the VEC appeals examiner because "Koger did not have notes for each day she was out, she was not disciplined for excessive absenteeism, she was disciplined for being excessively unavailable for work regardless of cause, and employees have to be legitimately sick to take sick leave." (Cooley Decl. ¶¶ 10-11.) The Sheriff's Office argued that Koger had been terminated pursuant to SOP 310 #04, which "states that excessive absenteeism, regardless of cause, whether approved or not approved is substantial evidence that the employee is not qualified for the job." (Cooley Decl. Ex. 5, Appeal to Commission.)[23] On February 13, 2009, the Commission issued a written opinion affirming the decision of the appeals examiner. (Cooley Decl. Ex. 7, Decision of Commission 4.)

On March 12, 2009, Woody appealed the decision of the Commission because SOP 310 sufficiently specifies the policy, and because "Koger's actions were intentional and willful, as is obviously demonstrated by her thirty three days of sick absences in less than a year." (Cooley Decl. ¶ 13.) Woody believes that his appeals are "well grounded in fact and warranted by existing law," and that the actions taken were for a proper purpose. (Cooley Decl. ¶ 16.) Koger

---

[22] Cooley's Declaration contains two exhibits marked "Ex. 5." Here, the Court cites the first Exhibit 5, the Decision of the Appeals Examiner.

[23] Here, the Court cites the second Exhibit 5, the Appeal to the Commission.

contends that no evidence exists that Woody "has ever carried any other employment commission case to such lengths." (Pl.'s Resp. 17.)

### III. Standard of Review

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. *Celotex*, 477 U.S. at 322-24. These facts must be presented in the form of exhibits and sworn affidavits. Fed. R. Civ. P. 56(c).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (*quoting Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). Ultimately, the court must adhere to the affirmative obligation to bar factually unsupportable claims from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (*citing Celotex*, 477 U.S. at 323-24).

# IV. Analysis

## A.    Applicable Law

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against any individual on the basis of that individual's "race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2(a). Section 704(a) of Title VII contains an anti-retaliation provision, which provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. 2000e-3(a). The anti-retaliation provision prevents "employer[s] from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). Courts interpret this provision broadly because the accomplishment of the goals of Title VII depends on the "cooperation of employees who are willing to file complaints and act as witnesses." *Id.* at 67.

### 1.    300-Day Time Limit

In a claim for retaliation, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). Any "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. Alleged retaliatory actions that fall more than 300 days prior to the initiation of an EEOC charge are time-barred. 42 U.S.C. § 2000e-5(e)(1); *Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 (4th Cir. 2002) (noting that "[b]ecause Virginia is a 'deferral state,'"

25

plaintiffs have 300 days from the last act of discrimination to file a retaliation charge with the EEOC) (internal citation omitted). Time-barred alleged retaliatory actions cannot form the basis of a Title VII lawsuit themselves but may be used as "background evidence in support of a timely claim."[24] *Nat'l R.R. Passenger Corp.*, 536 U.S. at 113.

### 2. Plaintiff Must Establish a Prima Facie Case

To succeed on a retaliation claim, a plaintiff must first establish a prima facie case of retaliation. A plaintiff must show that: (1) the plaintiff was engaged in a protected activity; (2) the employer acted adversely against the plaintiff; and, (3) the protected activity was causally connected to the adverse action. *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997) (*citing Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994)), *overruled on other grounds by Nat'l R.R. Passenger Corp.*, 536 U.S. at 105; *see also Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989).

### a. Protected Activity

Filing a complaint with the EEOC constitutes a protected activity. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 656 (4th Cir. 1998) (*citing Carter*, 33 F.3d at 460)). Providing assistance during an investigation of a Title VII claim or providing testimony during a Title VII proceeding similarly constitute protected activity. *See Crawford v. Metro. Gov't of Nashville & Davidson County*, 129 S. Ct. 846, 849 (2009) (holding that Title VII

---

[24] Although at oral argument counsel for Koger appeared to argue that the Supreme Court of the United States's decision in *Fed. Express Corp. v. Holowecki*, 128 S. Ct. 1147 (2008), permits Koger to recover for alleged retaliatory acts occurring outside the 300-day limitation, in subsequent briefing, counsel conceded the application of the 300-day time limit. (Pl.'s Resp. to Supp'l Br. in Supp. of Def.'s Mot. for Summ. J. ("*Holowecki* Br."), at 3 ("300 calendar days prior to January 8, 2008 is March 14, 2007. Koger may collect for any acts of retaliation subsequent to that date.").) (Docket No. 65.)

protection extends to employees who answer questions during an employer's internal investigation); *Glover v. S.C. Law Enforcement Div.*, 170 F.3d 411, 414 (4th Cir. 1999) (refusing to read into the statute a requirement that testimony in a Title VII proceeding be reasonable, and instead holding that "all testimony in a Title VII proceeding is protected against punitive employer action").

### b. Adverse Action

An adverse employment action subject to the anti-retaliation provision of Title VII causes an employee injury or harm. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67. However, "it is important to separate significant from trivial harms." *Id.* at 68. Therefore, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (*quoting Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (internal quotation omitted)).

### c. Causation

"To satisfy the third element, the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity." *Dowe*, 145 F.3d at 657. This requires first that the plaintiff prove that the employer knew that the plaintiff had engaged in a protected activity: such knowledge "is absolutely necessary to establish the third element of the prima facie case." *Id.* However, "the fact that an employer's knowledge of the protected activity is necessary to finding a causation connection, does not mean that it is also sufficient for such a finding." *Verrinder v. Rite Aid Corp.*, No. 3:06cv00024, 2007 WL 4357595, at *11 (W.D. Va.

Dec. 11, 2007) (*citing Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 n.9 (4th Cir. 1985));
*Williams*, 871 F.2d at 457.

In addition to knowledge, the plaintiff must offer some evidence to establish causation.
When temporal proximity provides the only evidence of causation, courts "uniformly hold that
the temporal proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268,
273-74 (2001) (finding that action taken 20 months later, by itself, did not establish causality)
(*quoting O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)); *King v.
Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (finding a gap of two months "sufficiently long
so as to weaken significantly the inference of causation between the two events").

If the plaintiff cannot offer evidence of close temporal proximity between the protected
activity and the adverse employment action, the plaintiff must offer additional evidence to
establish causation. *Lettieri v. Equant Inc.*, 478 F.3d 640, 649-50 (4th Cir. 2007) (finding that
regularly occurring events following the plaintiff's complaint constituted retaliatory animus
sufficient to establish causation) (*citing Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d
Cir. 2000)); *O'Neal*, 237 F.3d at 1253. Courts require this additional evidence of causation
because, just as a short time lapse may provide sufficient evidence of causality, "[a] lengthy time
lapse between the employer becoming aware of the protected activity and the alleged adverse
employment action . . . negates any inference that a causal connection exists between the two."
*Dowe*, 145 F.3d at 657; *see also Walker v. Johnson*, 501 F. Supp. 2d 156, 174 (D.D.C. 2007)
("Because approximately five months had elapsed between [the plaintiff's] EEO charge and the
Letter of Reprimand, the EEO charge was too remote to establish the final element of [the
plaintiff's] prima facie case.").

### 3. *McDonnell Douglas* Framework

Once a plaintiff has established a prima facie case of retaliation, in the absence of direct evidence, the Court must then analyze the claim for retaliation under the *McDonnell Douglas* burden-shifting scheme. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir. 2000); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). Under *McDonnell Douglas*, after the plaintiff has established a prima facie case, the burden shifts to the employer to provide a legitimate reason for the adverse employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802. The employer's burden to provide a legitimate, nonretaliatory reason is one of production, not persuasion, and does not involve a credibility assessment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (*citing St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). Furthermore, "mere knowledge on the part of an employer that an employee it is about to fire has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee." *Williams*, 871 F.2d at 457.

Although the burden of production shifts to the employer to provide a legitimate, nonretaliatory reason for the adverse employment action, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Therefore, if the employer provides a legitimate, nonretaliatory reason for an adverse employment action, "the plaintiff must then have an opportunity to prove by a preponderance of

the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*

The plaintiff need only produce sufficient evidence of the falsity of the employer's proffered reason for the adverse employment action. *Reeves*, 530 U.S. at 146-49 (rejecting the "pretext plus" requirement, which required plaintiffs to show "'*both* that the reason was false, *and* that discrimination was the real reason' for the challenged conduct" (*Jiminez v. Mary Washington College*, 57 F.3d 369, 377-78 (4th Cir. 1995) (*quoting St. Mary's Honor Ctr.*, 509 U.S. at 515))).[25] A plaintiff fails to demonstrate an employer's pretextual rationale for the adverse employment action "by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a 'genuine' dispute, the latter would fail to be 'material.'" *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006) (internal citations omitted). Moreover, the plaintiff's own determination that the employer's proffered reason for the adverse action is pretextual carries no weight. *Holland*, 487 F.3d at 218 (*citing Beall*, 130 F.3d at 620).

At the conclusion of the court's *McDonnell Douglas* analysis, a prima facie case combined with sufficient evidence of the employer's pretextual reason for the adverse employment action may permit a finding that the employer discriminated against the plaintiff. *Reeves*, 530 U.S. at 148.

---

[25] Some courts in the Fourth Circuit continue to apply the "pretext plus" analysis set forth in *St. Mary's Honor Center v. Hicks. See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 215 (4th Cir. 2007) (finding that plaintiff had failed to show that the employer's proffered reason for firing him was false where the plaintiff only offered as pretext evidence that the employer had changed his date of termination).

**B.** **Koger Fails to Establish Pretext as to Her Termination**

Koger places before the Court a lengthy record of allegedly retaliatory conduct, the

genesis of which she pins to the Beasley Investigation.[26] Yet she asserts only one count of

retaliation. (*See* 2d Am. Compl.) The Court presumes the single count of retaliation to refer

specifically to Koger's termination, as termination from employment undoubtedly constitutes an

adverse employment action, *see Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67, and Koger

has presented no argument specifically addressing that her allegations of retaliatory conduct,

other than her termination, constitute adverse employment actions. Thus, the Court begins its

analysis with Koger's termination.

**1.** **Koger Establishes a Prima Facie Case of Retaliation**

Koger establishes a prima facie case of retaliation with respect to her claim that Woody

improperly terminated her. First, Koger engaged in a protected activity by filing her second

EEOC charge on May 8, 2008. *See Dowe*, 145 F.3d at 656. Second, she suffered an adverse

action when Woody terminated her employment. *See Burlington N. & Santa Fe Ry. Co.*, 548

U.S. at 67. Finally, Koger can show causation because of the close temporal proximity of

Woody's receipt of notice that Koger had filed an EEOC charge and her subsequent termination:

---

[26] Koger cannot recover for the Beasley Investigation itself, however, because it falls
outside the 300-day period. Koger signed her EEOC charge of retaliation on May 12, 2008.
(2008 EEOC Charge.) March 14, 2007 falls 300 days prior to January 8, 2008. *See* n.24, *supra.*
Therefore, any instances of alleged retaliation prior to March 14, 2007 cannot be the basis of this
Title VII lawsuit and may be used only as "background evidence in support of a timely claim."
*Nat'l R.R. Passengers Corp.*, 536 U.S. at 113. Koger's allegation of the Sheriff's Office's
retaliatory motive for its pursuit of the Beasley Investigation falls outside the 300-day period
because it occurred prior to March 14, 2007. Any discussion of this allegation is relevant for
background purposes only.

Woody terminated Koger a mere three days after the EEOC mailed the 2008 EEOC Charge.[27]
*See Clark County Sch. Dist.*, 532 U.S. at 273-74; *Carter*, 33 F.3d at 460 ("This court found a causal connection between a plaintiff's protected activity and her discharge where the employer, with knowledge of a pending discrimination complaint, fired plaintiff approximately four months after the complaint was filed."). This sufficiently establishes a prima facie case of retaliation.

## 2.    Koger Fails to Show Pretext

Although she has established a prima facie case of retaliation as to her claim that Woody improperly terminated her employment, Koger cannot survive summary judgment because she fails to show pretext. Pursuant to the *McDonnell Douglas* framework, once a plaintiff has met the requirements of a prima facie case, the defendant must then put forth a legitimate reason for the adverse employment action it took against the plaintiff. *McDonnell Douglas*, 411 U.S. at 802. In this case, Woody more than satisfies this burden.

Woody testified that he terminated Koger for her overall record, which included that she had disobeyed direct orders from supervisors, suffered an attendance problem, and had fallen asleep on the job. (Woody Decl. ¶ 11.) Each of these reasons rests on legitimate, non-discriminatory grounds.

---

[27] Koger fails to adduce any evidence of Woody's actual receipt of the EEOC notice of Koger's 2008 EEOC Charge. However, construing the facts in the light most favorable to Koger, the Court will presume that Woody received the letter immediately after its mailing on May 12, 2008, and prior to his termination of Koger on May 15, 2008. (*See Holowecki* Br. 4 (*citing Williams v. Enter. Leasing Co.*, 911 F. Supp. 988, 991 (E.D. Va. 1995) ("Thus FRCP 6(e) provides the presumption that if the date of receipt is unknown or in dispute, courts will presume receipt three days after mailing.")).)

Because Woody has offered non-discriminatory justifications for Koger's termination, the presumption of retaliation has "drop[ped] out of the picture." *Reeves*, 530 U.S. at 143. The burden then shifts back to Koger to show evidence of pretext, and she fails to meet this burden. *See Burdine*, 450 U.S. at 253.

No evidence before the Court suggests that Woody terminated Koger for any reason other than her abysmal performance as an employee.[28] First, as to her attendance, the record is replete with evidence of Koger's absenteeism. Prior to Woody's tenure as Sheriff, Koger had received seven written notices (Winzor Decl. ¶¶ 5, 7, 8, 10, 11, 12, 13 & Exs. 1, 3, 4, 6, 7, 8, 9), one oral notice (Winzor Decl. ¶ 9, Ex. 5), and one counseling notice (Winzor Decl. ¶ 6, Ex. 2) that she failed to follow procedures to call in sick, that she failed to document properly her absences from work, or that she was excessively absent from work. After Woody assumed office, four different supervisors again issued Koger four separate reprimands, all specifically related to her attendance. (Olsen Decl. ¶¶ 3-5; McRae Decl. ¶ 3; Thompkins Decl. ¶¶ 5-6; Whitt Decl. ¶¶ 18, 28.) Two supervisors recommended Koger's termination based solely upon her attendance. (Woody Decl. ¶ 2; Whitt Decl. ¶ 28.) One recommendation predates Koger's interaction with Woody. (Woody Decl. ¶ 2 (stating that one month after Woody assumed office, Sink recommended Koger's termination based on her performance during the previous years).) In nearly every instance, Koger fails to show knowledge of protected activity by the supervisors reprimanding her for her poor attendance record. Thus, ample evidence establishes the legitimacy of this reason as a basis for Koger's termination.

---

[28] Koger's own unsworn assertion that "she was not a bad employee or a discipline problem" (Pl.'s Resp. 3.), does not create a genuine dispute as to this fact.

33

Although Koger raises several disputes as to her absentee record, the Court finds that she raises no genuine disputes of material fact. Koger's 2007 year-end evaluation, which indicates Koger's satisfactory attendance, fails to create a genuine issue of material fact because, even if properly before the Court,[29] it contains information that she needed to improve attendance.[30] (*See* Pl.'s Resp. Ex. C, Employee Performance Plan/Evaluation FY 2007 3, 6 (checking off that Koger meets expectations as to punctuality and attendance while also stating that Koger would be an asset to the Sheriff's Office "[i]f [she] improves her attendance").) Koger places no other evidence in the record to demonstrate her satisfactory performance save for a positive evaluation from Bart, who supervised Koger during 2004 and 2005, a time period irrelevant to the issue before the Court. (Nov. 2009 Bart Aff. ¶ 3.)

Moreover, Koger's subjective belief that she was not in violation of the sick leave policy does not create a genuine issue of material fact. *See Hux*, 451 F.3d at 315. Koger attempts to avoid this result by arguing that she could not have been in violation of the leave policy because she had leave time available to her on the date she was fired. However, leave accrues at the end of each month. (*See* Def.'s Rebuttal Ex. B, Byrd Decl. ¶ 7 (noting that leave "accrues at the end of each month").) Therefore, whether Koger had leave available to her in May of 2008 does not indicate her compliance with the leave policy prior to May 2008. Thus, Koger fails to create a genuine issue of material fact with respect to her compliance with the sick leave policy.

---

[29] Koger presents this evaluation sans authenticating affidavit. *See* F. R. Civ. P. 56(e).

[30] Moreover, "[P]rior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual." *Billet v. CIGNA Corp.*, 940 F.2d 812, 826 (3rd Cir. 1991), *overruled on other grounds by St. Mary's Honor Ctr.*, 509 U.S. at 502. "To hold otherwise would be to hold that things never change, a proposition clearly without basis in reality." *Id.*

Second, as to other instances of discipline unrelated to absenteeism, the Court finds that both the VCU Investigation and the Incident Reports Investigation were individually warranted, and that Koger has failed to adduce any evidence that the reason Woody gave for his decision to terminate her employment, based in part on these events, was false. *See Reeves*, 530 U.S. at 146-49 (requiring that, to establish pretext, the plaintiff need only produce sufficient evidence that the employer's proffered reason for the adverse employment action was false). As to the VCU Investigation, Woody testified that he assigned Lawson this task because he "was particularly concerned about this allegation of misconduct because it came from a member of the public, the Sheriff's Office had an ongoing relationship with VCU, there had been similar allegations in the past by VCU, and the allegation, if true, put the inmate and the staff at VCU in potential danger." (Woody Decl. ¶ 4.) Moreover, Koger presents no challenge to the fact that a complaint came from a member of the public and that "[t]he allegations, if true, were serious." (Def.'s Br. in Supp. of Mot. for Summ. J. 23, ¶ 103.) The Court cannot infer a retaliatory motive as to this investigation when the Sheriff's Office followed up on a complaint from a neutral party. Moreover, the record patently establishes that Koger fell asleep on the job. (*See* Lawson Decl. ¶ 8.)

Nor does Koger present sufficient evidence of the falsity of the reason proffered for the Incident Reports Investigation. Koger does not deny printing incident reports. Instead, she presents evidence that "these documents are not protected," and that at least one supervisor has not seen any other employees disciplined for pulling these records. (Nov. 2009 Bart Aff. ¶ 17.) However, IAD issued Koger a reprimand for "disseminating information from the Sheriff's Office" (Clevert Decl. Ex. 1), and, according to the SOPs, such "[u]nauthorized disclosure of

35

sensitive or confidential information" from the Sheriff's Office may result in immediate termination. (Def.'s Br. in Supp. of Mot. for Summ. J. Ex. A, Allmon Decl. ("Allmon Decl."), Ex. 4, SOP 310 at RCS001-01868.) Thus, the evidence indicates that the Sheriff's Office began an investigation because Koger's actions may have violated the SOP. Koger has failed to show that the reason given for this investigation was pretext.

The record demonstrates that any one of Woody's proffered reasons provided a legitimate reason for Koger's termination. Koger has not produced sufficient evidence to suggest the falsity of any of Woody's reasons. On such a record, this Court will not second-guess Woody's personnel decision. *Cf. DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). Moreover, the Court notes that, although the VEC determined that Koger merited unemployment benefits because the SOPs were unclear, the VEC's determination does not create a genuine issue of material fact as to the reasons Woody gave for his decision to terminate Koger. The VEC considered only Koger's attendance, and this Court has before it a more fulsome record. Therefore, Koger simply fails to offer any competent evidence that Woody's decision to terminate her employment arose from a retaliatory motive, and not from Koger's shortcomings as an employee.

C.    **Koger's Other Allegations of Retaliatory Conduct Also Fail**

Despite the fact that the Court has before it only one count of retaliation, it is clear from her briefing that Koger seeks recovery for various other allegedly retaliatory acts that occurred both prior to and following her termination. Koger alleges that Woody retaliated against her prior to her termination when: (1) he accused her of infractions she had not committed; (2) he transferred her to another post; (3) he subjected her to repeated IAD investigations in violation of

the Sheriff's Office SOPs; and, (4) he thwarted her right to properly appeal her infractions in violation of the Sheriff's Office SOPs. (2d Am. Compl. ¶ 111.) Koger alleges that Woody retaliated against her after her employment terminated when he denied and repeatedly appealed, without meritorious reason, Koger's application and award of unemployment benefits.[31] (2d Am. Compl. ¶ 111).

Even were the Court to presume that each of these alleged actions constituted an adverse employment action, and that Koger had properly presented each in a count pending before this Court, the Court would nevertheless find that Koger's claims fail. The majority of Koger's allegations retaliatory conduct fail to establish a prima facie case of retaliation. Even where she establishes a prima facie case, Koger fails to show pretext.

### 1.    Koger's Pre-Termination Allegations

Koger contends that, prior to her termination, Woody accused her of infractions she had not committed; subjected her to repeated IAD investigations in violation of the Sheriff's Office SOPs; and thwarted her right to properly appeal her infractions in violation of the Sheriff's Office SOPs. Each of these claims must fail. Koger cannot establish a causal connection between these allegedly adverse actions and her protected activity. *See Williams*, 871 F.2d at 457 (stating that to establish a prima facie case of retaliation, a plaintiff must prove that she engaged in a protected activity, her employer took adverse action against her, and that a causal connection exists between the protected activity and the adverse action).

---

[31] As noted above, although Koger alleges additional retaliatory actions that occurred after her termination, the Court will not consider them. *See* n.21, *supra.*

### a. Koger's Absentee Record

First, Koger fails to establish a prima facie case that Woody disciplined her for infractions she had not committed because she cannot present any evidence that the Sheriff's Office disciplined her for absenteeism *because* she had engaged in protected activities. *See Dowe*, 145 F.3d at 657. As discussed above, the Court has before it ample evidence that Koger suffered an attendance problem, and that various supervisors disciplined her for missing work. (*See, e.g.,* Whitt Decl. ¶ 17 (describing Koger's record of "absences for sickness . . . [as] the worst [Whitt] had ever reviewed").) Before Woody's tenure as Sheriff, Koger had received a total of nine disciplinary actions as a result of her attendance. (Winzor Decl. ¶¶ 5, 7, 8, 10, 11, 12, 13 & Exs. 1, 2, 3, 4, 6, 7, 8, 9.) After Woody assumed office, Koger received four more reprimands from four different supervisors for attendance issues. (Olsen Decl. ¶¶ 3-5; McRae Decl. ¶ 3; Thompkins Decl. ¶¶ 5-6; Whitt Decl. ¶¶ 18, 28.) Thus, no evidence exists to suggest that Koger's supervisors disciplined her for absenteeism *because* she had engaged in protected activities. *Dowe*, 145 F.3d at 657. Rather, the record demonstrates that Koger's supervisors disciplined her for a continuing problem with attendance.

Furthermore, the record is entirely devoid of any evidence that any of the four disciplining supervisors during Woody's administration knew that Koger had engaged in a protected activity. Such knowledge "is absolutely necessary to establish the third element of the prima facie case." *Dowe*, 145 F.3d at 657. Koger avoids issue of notice, except to imply that her statement to Servellon during the February 2007 interview, her initiation of the 2008 EEOC Charge, or her appearance on a witness list in February 2008 should be sufficient for the Court to impute notice to Woody, and to each of the other supervisors who disciplined her, that she had

engaged in some type of protected activity. The timing of many of these dicliplinary incidents would not support an inference of causation. Even were the Court to impute this knowledge to her supervisors, knowledge alone, in this case, insufficiently establishes causation. *Verrinder*, 2007 WL 4357595, at *11 (*citing Ross*, 759 F.2d at 365 n.9); *Williams*, 871 F.2d at 457. Koger cannot show the Court that any discipline she received for her attendance resulted from her involvement in protected activities, and not from her shortcomings as an employee. Thus, Koger fails to establish a prima facie case with respect to this aspect of her claim.

### b. VCU and Incident Reports Investigations

Second, Koger fails to present any evidence of causation with respect to the discipline she received as a result of the VCU and the Incident Reports Investigations.[32] As to the VCU Investigation, as described above, Woody testified why Lawson he assigned to investigate.[33]

---

[32] Koger also fails to address that how these disciplinary events, alongside attendance problems, nonetheless constitute pretext.

[33] Koger attempts to argue that there exists a genuine issue of material fact as to the IAD investigations because Woody assigned Lawson to investigate the VCU incident rather than permitting the investigation to move forward through Koger's chain of command. (Pl.'s Resp. 19 (referring to Lawson as Woody's "hatchet man").) Koger argues that this violates the Sheriff's Office SOPs. (Pl.'s Resp. 19; Koger Aff. 5 ("The standard Operating Procedures (SOP) required disciplinary action start at the lowest level.").)

The Court disagrees. SOP 310 details "Steps of Progressive Discipline," and the types of reprimands superior officers may issue. (Allmon Decl. ¶¶ 14-16 & Ex. 4.) The SOP does not require any investigations to proceed through the chain of command. Instead, it merely provides that "[a] higher-ranking employee can initiate a disciplinary matter under SOP 310 against a lower ranking employee." (Allmon Decl. ¶ 15.) Indeed, "[t]here is no requirement in the SOPs or elsewhere that disciplinary actions be initiated at the lowest level or the employee's next highest ranking supervisor, e.g. a sergeant in the case of a deputy." (Allmon Decl. ¶ 22.) SOP 310 makes this clear: "Discipline *can* progress incrementally from the lowest to the highest level . . . *[or] steps can be skipped* or the employee maybe terminated, particularly if the offense creates a serious result or liability for the office. Every action requires a case-by-case analysis." (Allmon Decl. Ex. 4 at RCS001-01568 (emphasis added).) Nowhere do the SOPs confirm Koger's belief that all disciplinary action must start at the lowest level.

39

(Woody Decl. ¶ 4.) Koger presents no evidence that Woody initiated this investigation *because* Koger had engaged in protected activities. *Dowe*, 145 F.3d at 657.

Moreover, even if the Court considers the close temporal proximity of Koger's January 2008 initiation of the retaliation charge and the February 2008 initiation of the VCU Investigation, the Court nevertheless finds that Koger fails to establish causation. Koger has presented no evidence that, at the time Woody assigned Lawson to conduct the VCU Investigation, Woody knew that Koger had initiated the 2008 EEOC Charge. The Court requires such knowledge in order to establish causation. *Id.*

Nor can Koger demonstrate that the Incident Reports Investigation occurred *because* of her protected activities. *See id.* IAD began investigating Koger in May of 2008 when it learned that Koger had removed documents from the Sheriff's Office. (Clevert Decl. ¶ 12.) In April and May, two officers reported seeing Koger access and print incident reports concerning several erroneous releases of prisoners. (Gray Decl.¶ 3; Jackson Decl. ¶¶ 3-4.) Koger presents no evidence to suggest that either of these officers knew Koger had engaged in protected activity by filing an EEOC complaint or agreeing to serve as a witness for Garrett and Aycock. Moreover, as described above, the dissemination of information constitutes a violation of the SOPs. (Allmon Decl. Ex. 4, SOP 310 at RCS001-01868.) Thus, Koger has presented no evidence that

---

Koger has adduced no evidence indicating that the SOPs require disciplinary actions to proceed through an employee's chain of command. Moreover, SOP 310 specifically states that the steps of progressive discipline do not apply to internal affairs investigations. (Allmon Decl. Ex. 4 at RCS001-01863.) Therefore, because Koger has produced no evidence to support her argument that she was subjected to procedurally deficient investigations, the Court finds that this does not constitute a genuine issue of material fact.

IAD initiated this investigation *because* Koger had engaged in protected activities, and not because it had learned of a potential violation of the SOPs. *See Dowe*, 145 F.3d at 657.

### c.  Appellate Procedures

Finally, Koger fails to present any evidence of causation as to her claim that the Sheriff's Office denied her proper appellate procedures with respect to the written reprimands issued by McRae and Thompkins for excessive absenteeism and failure to follow proper procedures to call in sick. Koger contends that the Sheriff's Office's refusal to grant her proper appellate procedures rises to a violation of the SOPs. (*See* Koger Aff. 6.) Koger presents no evidence, however, that Burnett, who handled the appeals, knew she had engaged in protected activity. Thus, Koger cannot establish causation. *Dowe*, 145 F.3d at 657. Therefore, Koger cannot establish a prima facie case of retaliation as to this aspect of her claim.[34]

### d.  Koger Establishes a Prima Facie Case as to Her Claim That She Was Transferred

The only pre-termination claim for which Koger etablishes a prima facie case of retaliation is her claim that Woody transferred her. Koger engaged in a protected activity by

---

[34] As she did regarding the IAD investigations, Koger attempts to create a genuine dispute of material fact because she believes the Sheriff's Office mishandled her appeals in violation of the SOPs. Koger alleges that "[t]he SOP requires all appeals to be in writing. They also grant the deputy up to five business days to prepare and submit an appeal." (Koger Aff. 6.) Koger alleges that she was denied these procedures because her first appeal of Thompkins's reprimand was never read and she "was denied the right to submit a second appeal as required by SOP." (Koger Aff. 6.)

The Court determines that no genuine issue of material fact exists. As with the relevant procedures for IAD investigations, here, Koger misreads the SOP. SOP 310 does not require appeals to be in writing. Instead, SOP 310 explicitly states that employees "*are encouraged, or may be directed*, to respond in writing" to explain why a lesser disciplinary action may be appropriate. (Pl.'s Resp. Ex. CC, SOP 310, at RCS001-01546 (emphasis added).) The dispute, therefore, is not genuine and does not preclude summary judgment.

filing an EEOC charge of discrimination on July 10, 2007. *See id.* The Court will presume, without finding, that she suffered an adverse action as a result of a transfer to a different department. (*See* Bart Aff. ¶ 11 ("The W-1 post at the jail is just about the worse assignment at the Department . . . ."); Felthoff Aff. ¶ 9); *cf. Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67 (defining "adverse action" as one that causes injury or harm). Finally, Koger presents sufficient evidence of the close temporal proximity between her transfer from the Jail Annex to Uniform Operations and Woody's knowledge that she had filed an EEOC charge because Koger signed her first EEOC charge one day prior to Woody's decision to transfer her. (Woody Decl. ¶ 9 (stating that on July 11, 2007, Woody transferred Koger).) Therefore, Koger has established a prima facie case with respect to this aspect of her claim.

Even so, this claim must fail. Koger proffers no evidence that Woody's reason for transferring her was pretextual. The Court notes that Koger requested to transfer to a day shift for health reasons (*see* May 13, 2007 Koger Email), and that Woody only partially complied with her request when he transferred her to a shorter shift, but nevertheless another night shift (*see* Woody Decl. ¶ 9). However, Koger simply presents no evidence that her transfer to any particular post was done with retaliatory intent. Woody certainly did not seek Koger out. Woody transferred Koger in response to her request and, he testified, because the shift to which he assigned her needed deputies (Woody Decl. ¶ 9), and specifically deputies with Koger's qualifications (Whitt Decl. ¶ 36). Moreover, even if the Court were to presume that Woody manufactured the transfer as a result of Koger's protected activities, the decision to transfer Koger cannot countermand the overwhelming evidence on the record of her poor attendance, or the legitimacy of either the VCU Investigation or the Incident Reports Investigation. "It is not

42

enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor Ctr.*, 509 U.S. at 519. Thus, Koger's claim must fail.

## 2.    Koger's Post-Employment Allegation

As noted above, the Court will discuss only Koger's claim as to her unemployment benefits. *See* n.21, *supra*. As with many of her pre-termination claims of retaliation, with this claim, Koger fails to establish a prima facie case of retaliation. Koger spends the bulk of her briefing contesting the basis of Woody's appeal to the Circuit Court for the City of Richmond.

Even were this Court to assume, without finding, that an improper appeal of unemployment benefits could constitute an adverse employment action,[35] Koger fails to produce any evidence of causation. "This Court has held that evidence that the alleged adverse action occurred *shortly* after the employer became aware of the protected activity is sufficient to 'satisf[y] the less onerous burden of making a prima facie case of causa[tion].'" *Dowe*, 145 F.3d at 657 (*quoting Williams*, 871 F.2d at 457) (alterations in original). However, "[a] lengthy time lapse between the employer becoming aware of the protected activity and the allegedly adverse

---

[35] It is not clear to this Court that an appeal of unemployment benefits constitutes an adverse employment action. *Compare Roman v. Cornell Univ.*, 53 F. Supp. 2d 223, 245 (N.D.N.Y. 1999) (pre-dating the Supreme Court's decision in *Burlington Northern*, but holding that a retaliation based on opposing plaintiff's application for unemployment benefits could not survive a motion for summary judgment because it was "not an adverse employment action"); *Baker v. Summit Unlimited, Inc.*, 855 F. Supp. 375 (N.D. Ga. 1994) (granting summary judgment for defendant because it had a right to defend the unemployment action after plaintiff pursued benefits), *with Steele v. Schafer*, 535 F.3d 689, 696 (D.C. Cir. 2008) (noting in *dicta* that plaintiff's claim that employer retaliated by *falsely* contesting plaintiff's unemployment benefits "involve[d] conduct that ... the Supreme Court has already indicated can support a retaliation claim" in *Burlington Northern & Santa Fe Railroad Co. v. White*).

employment action . . . negates any inference that a causal connection exists between the two."
*Id.*; *see Clark County Sch. Dist.*, 532 U.S. at 273-74 (requiring a close temporal proximity and noting that two courts of appeals have found a 3-month and a 4-month gap insufficient to establish causation).

Here, Koger filed the 2008 EEOC Charge on May 12, 2008. (2008 EEOC Charge.) On October 21, 2008, the VEC qualified Koger for unemployment benefits. (Cooley Decl. Ex. 5.) Thereafter, the Sheriff's Office appealed. This creates a 5-month gap between May 2008, the date Koger signed the 2008 EEOC Charge, and October 2008, the date the Sheriff's Office appealed the award of unemployment benefits. This gap insufficiently establishes causation. *See Clark County Sch. Dist.*, 532 U.S. at 273-74. Koger has offered no additional evidence to establish causation.[36] *See O'Neal*, 237 F.3d at 1253 (requiring additional evidence when temporal proximity is insufficient to establish causation). Therefore, Koger fails to establish a prima facie case as to this aspect of her claim.

### V. Conclusion

"Permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958). Here, the Court must exercise its duty to withdraw this case from the jury because Koger has alleged facts sufficient only to support tenuous inferences based on

---

[36] To the extent this Court were to go beyond Koger's arguments and look to the initial opposition of unemployment benefits as a basis for causation, the Court's findings above establish a legitimate, non-discriminatory basis for the positions taken by Woody at the VEC and, also for the reasons articulated above, the Court's findings establish that Koger has not established pretext.

speculation, and to find in Koger's favor would require the Court "to pile inferences on inferences." *Houchens v. Am. Home Assurance Co.*, 927 F.2d 163, 167 (4th Cir. 1991). As a matter of law, Koger cannot demonstrate sufficient evidence of Woody's retaliatory intent to survive summary judgment.

Accordingly, the Court will GRANT Defendant's Motion for Summary Judgment. (Docket No. 37.) Plaintiff's Second Amended Complaint will be DISMISSED WITH PREJUDICE. (Docket No. 20.)

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States Magistrate Judge

Richmond, Virginia
Date: January 26, 2010